## TRUST NO. 5833, SECURITY-FIRST NAT. BANK OF LOS ANGELES v. WELCH, Collector of Internal Revenue.
### No. 3721-M.

District Court, S. D. California, Central Division.

March 21, 1931.

Dana Latham, Miller, Chevalier, Peeler & Wilson, Melvin D. Wilson, Gibson, Dunn & Crutcher, and Henry F. Prince, all of Los Angeles, Cal., for plaintiff.

Alva C. Baird, Sp. Atty. for the Bureau of Internal Revenue, of Washington, D. C., and Emmett E. Doherty, Asst. U. S. Atty., and Samuel W. McNabb, U. S. Atty., both of Los Angeles, Cal., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, of Washington, D. C., for defendant.

McCORMICK, District Judge.

This is an action to compel refund of $4,147.93, representing federal income taxes computed at the prevailing corporate rate for the calendar year 1928. The amount sued for was paid under protest by plaintiff, Security First National Bank of Los Angeles, as trustee, to the defendant collector. The sole question for decision is whether the project or enterprise denominated Trust No. 5833, as it is disclosed by the evidence, is an association within the purview of section 701 (a) (2) of the Revenue Act of 1928, 26 US CA § 2701 (a) (2). The pertinent part of that section reads: "The term 'corporation' includes associations, joint-stock companies, and insurance companies." The defendant collector demanded and collected the tax from plaintiffs upon the ground that it was an association as described in the Revenue Act aforesaid. The plaintiffs contend that such ruling was erroneous and illegal, and that the enterprise under consideration is shown by the evidence herein not to be an association within the aforesaid section, but that it is to be considered solely as a fiduciary for income tax purposes. It is admitted that, if the enterprise is properly classified as an "association," the amount sued for cannot be recovered by plaintiff herein.

The following facts have been established: In October, 1924, one Cotton, a real estate operator in Los Angeles, Cal., in association with other persons, undertook to acquire by purchase a tract of approximately 90 acres of land, to improve the same by laying out streets and other ways, to install sidewalks, water, electricity, and other utilities therein, and to subdivide the tract into city lots and to sell them to the public at a substantial profit. The scheme involved an outlay of capital both for the purchase price of the acreage and also to pay for the improvements and subdivision expenses. The land was owned by the Southern California Edison Company, which agreed to sell it to Cotton and his associates for $810,000. The contemplated improvements amounted to approximately $250,000. A written contract of sale of the tract was accordingly entered into by one Farran acting as the agent of the buyers and promoters, Cotton and his associates, and the Southern California Edison Company, the seller. The agreement provided for the payment of $100,000 in cash and the balance of the purchase price within 90 days of the date of the contract. In order to finance the project, a syndicate of some 40 persons was organized. These persons were invited by Cotton and his associates to subscribe and invest various amounts of money in the undertaking ranging from $1,000 to $15,000 each. The purpose of the syndicate as well as the invitation to join therein was to enable the participants to realize a profit upon their investments in the project. The aggregate amount realized from such subscriptions was $250,000. The contract with the Edison Company was assigned to the Security Trust & Savings Bank, predecessor of one of the plaintiffs herein as trustee. Concurrently, the subscribers of the $250,000 paid their money to said trustee. The Security Trust & Savings Bank, as such, advanced the further sum of $400,000 to the project, and took a first lien upon the assets of the enterprise as its security for payment of such loan with interest. An additional sum of $212,500 was advanced by Cotton and an associate, Bryan, and these two took a second mortgage on the assets of the enterprise as security for the payment of their loan, with interest. The moneys thus obtained in accordance with a written instrument denominated as a declaration of trust, Trust No. 5833, were applied on the purchase price of the 90-acre tract of land.

The declaration of trust under which the project was so launched and carried out is a lengthy document that has been introduced in evidence herein, and that has been carefully considered by the court. I consider it unnecessary to set it forth in extenso. Suffice it to say that it conforms generally to similar instruments common in the realty subdivision activities of Los Angeles, Cal., and is what is popularly known therein as a "real estate subdivision trust." It was executed by the Security Trust & Savings Bank as trustee, Dean Farran, acting on behalf of Cotton and associates as trustor, and the subscribers or investors of the $250,000 as beneficiaries. It provided a complete, and to some extent a self-executing, scheme for the payment of the purchase price of the property; the payment of the two mortgage loans; the reimbursement of those who had

subscribed and invested money therein; the payment of all expenses attendant upon the improvement and subdivision of the tract of land and for the sale of the entire subdivided parcel of real property. It declared that all beneficial interest in the trust is owned by the investors of the $250,000, and that such interest be divided into units of $100 each, and that each beneficiary shall be deemed to hold one of such units for each $1,000 that he had paid into the trust or should thereafter pay into it. It provided that, in all dealing with the trustee and the beneficiaries, the trustee shall be bound by the written direction of any three of the board of five beneficiaries termed the "board of syndicate managers," which board was chosen by the subscribers of the $250,000, and had power to establish the price at which the real property was to be sold by the trustee; to fix the terms of sale; the manner, method, and time of disposition of the proceeds of such sale; the person to whom all money coming into the hands of the trustee under the declaration was to be paid after certain payments rigidly fixed by the declaration of trust had been made; the amount of such payments; to fix the restrictions, covenants, conditions, and reservations under and upon which the property or any part of it shall be sold; the form of deeds and contracts to be executed by the trustee in case of any sales; to fix and determine the manner, method, cost, and improvement of the property; and in all other respects to have the power to bind each and every beneficiary in all dealings with the trustee and with other parties in connection with the subdivision and sale of the property. It provided that no lot is to be sold by the trustee for less than the minimum price thereof fixed by a schedule of minimum prices that was annexed to said declaration and made a part thereof, but, as before stated, it gave to the syndicate managers the power of fixing the prices at which the property of the subdivision might be sold. A real estate firm of Los Angeles was irrevocably constituted the agent of the beneficiaries for the sale of the property for a period of two years from the date of the declaration of trust, but, as just adverted to, the sales agency could sell the real property only upon such price, terms, restrictions, and covenants as were fixed by the board of managers by written direction to the trustee and subject to such conditions. The sales agency could direct the trustee to convey the property with the same force and effect as if such direction had been given by the board of managers' direction. At the expiration of two years, the board of managers were authorized to designate some other agency, if it so desired, for the sale of the trust property.

The trustee is directed to apply the proceeds of sales to the payment of taxes, costs, charges, and expenses, etc.; to the payment of its own services; to the payment of money loaned the project by the bank, by Cotton, and by others, and to the payment to the subscribers to the amount that they had subscribed to the project and certain additional amounts specifically mentioned and designated in the trust instrument, and, in addition, to pay as directed by the board of managers any further amount of money that would be received by them on account of sales of real property of the trust as directed by the board of syndicate managers.

The declaration provided that the beneficiaries agreed that they would subdivide and improve the real property as provided in the trust instrument, and that such work of improvement would be installed and completely and fully paid for within two years of the date of such instrument.

It also provided that the trustee may resign and discharge itself of the trust by a written notice to the board of managers thirty days before such resignation shall take effect, and successor may thereupon be appointed by an instrument in writing executed by the beneficiaries and accepted by the successor trustee. Should the beneficiary fail to make such appointment before the expiration of such thirty-day period, then the trustee may thereupon appoint a temporary successor trustee to fill such vacancy until such successor be appointed by the beneficiaries, and it further provided that any such successor should be vested with all the estates, rights, powers, and duties of its predecessor trustee. It was also stated in the declaration of trust that no sale or transfer of beneficial interests under the trust shall be valid or binding upon the trustee until the instrument making such assignment or transfer shall have been approved by and deposited with the trustee excepting only where such interest may pass or be transferred by a judgment or decree of court, and then only upon proof satisfactory to the trustee of the legality and validity of the procedure in such matters being presented to the trustee. It stated that the legal and equitable title to the real property was vested in the trustee for the purposes of administering the trust, and that no person beneficially interested in the trust has any right, title, interest, or estate in the property covered by the declaration, nor has any

person beneficially interested under said declaration of trust any right or power to apply for or secure a dissolution or termination of the trust or partition or division of any of the trust estate; it being further recited that the entire beneficial interest of any and all beneficiaries under the declaration of trust is personal property only consisting of the right to enforce the performance of this trust according to its terms. It was further provided in the declaration that the trust shall continue to and until the sale and disposition in fee of all the property subject to the trust and the disposition of all proceeds thereof in accordance with the terms of said declaration of trust or until the expiration of twenty-five years, whichever event shall happen first. There are other and further provisions in the declaration of trust, but sufficient has already been stated to designate the character of the instrument as well as the classification of the component entities and persons that are described therein. It seems clear that the structure or project created by it is a business enterprise wherein the beneficiaries exercised an ultimate effective control. They had absolute power to remove the board of managers. It is true that the trust in many respects was self-executing, and to some extent was an escrow and security device. It was, however, also a functioning, operating business carried on for profit by the joint action of the trustee, beneficiaries, and sales agents.

[1, 2] The potent and motivating element of the trust was its control by the board of syndicate managers. Their sole power to fix prices at which the lots could be sold was the energizing and paramount principle of this business scheme. Not only did the declaration of trust vest in the board of syndicate managers such plenary power of control not unlike that conferred upon corporate directors, but they exercised such powers throughout the operations of the trust. The work of improving, subdividing, and selling the tract was carried out under its direction. It held meetings; fixed and paid a per diem to the members of it who attended the meetings; formally approved contracts for improvements; authorized the payment of commissions and escrow charges; approved expense accounts; and altered the usual terms of sales as specified in the declaration of trust. If the test as to the character of the trust under consideration is to be determined by the control of the property by those beneficially interested as investors of the $250,000, there can be little doubt that such association of persons dominated.

The weight of judicial authority, however, inclines one to the opinion that the real test as to whether business trusts are "associations" within the meaning of applicable internal revenue statutes is whether the shareholder or trustees or both combined carry on business for profit, and, if they do, they constitute a business trust—in legal effect, an "association"—with liability for taxes as a corporate entity, and not as a mere fiduciary or escrow. It is immaterial as to whether the shares or interests in the project are evidenced by certificates of stock or by any other written evidences of ownership. The beneficial interest of the beneficiaries in this trust clearly existed and was assignable and transferable as other personal property. The evidence shows that the owners of beneficial interest frequently sold the same, and that a legal form was provided for the purposes of sale and transfer, and it appeared that ten units were assigned during the calendar year 1928, and that there were other units assigned by the owners for collateral purposes. It is true that the enterprise sold only one lot during the year 1926, but during that period the sales agency was actively engaged in an effort to dispose of the unsold lots, and that in the period approximately $340,000 was collected on lot sales, interest, etc., and that the total expenses for administration for the same period amounted to approximately $30,000. It is unnecessary to review all of the evidence as to the financial operations of the enterprise. Suffice it to say that it was a very profitable venture, and resulted, not only in the payment in full of all obligations incurred on account of the purchase, improvement, subdivision, and sale of the tract of land, but, in addition, made a handsome profit to all who invested or were interested in the enterprise. It seems to me that to classify this trust as a mere liquidating trust such as those encountered in the administration of estates of deceased persons or in financially embarrassed businesses or projects would be an unreasonable classification. In Hecht v. Malley, 265 U. S. 157, 44 S. Ct. 462, 467, 68 L. Ed. 949, the Supreme Court said: "The word 'association' appears to be used in the Act in its ordinary meaning." And in Little Four Oil & Gas Co. v. Lewellyn (C. C. A. 3) 35 F.(2d) 149, the court clearly points out, in so far as federal income taxes are concerned, a distinction between two classes of trusts, one where the trustees merely collect dividends or interests or rentals, and distribute them among the beneficiaries, and the other where a trust is organized or declared for business purposes and the trus-

tees carry on an active business for profit. In the former, tax classification as fiduciaries are authorized while in the latter, a tax liability ensues at the usual corporate rate because such trusts are regarded in law for taxation purposes as plain unincorporated joint-stock associations. I am of the opinion that the project under consideration here is analogous to those discussed in the cases of Hecht v. Malley, supra, and Little Four Oil & Gas Co. v. Lewellyn, supra.

All of the characteristics present in the trusts considered in those cases do not exist in the enterprise under consideration, but, in my opinion, the main and determinative qualities and features of the trusts discussed by the courts in each of those cases are present in the case at bar. It follows from the foregoing that the collector of internal revenue was correct in the assessment of the tax imposed upon plaintiff, and that plaintiff is not entitled to a refund of the same. The special findings of fact and conclusions of law submitted by the plaintiff are disallowed, and the special findings of fact and conclusions of law proposed by the defendant, with certain changes upon said document as filed in the clerk's office, are ordered prepared herein, and pursuant thereto judgment is ordered for the defendant, with costs of suit. Counsel for defendant will accordingly prepare, serve, and present the same for signing and entry herein.